[No. B147084. Second Dist., Div. Three. Sept. 20, 2001.]

CONTINENTAL CASUALTY COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PARAGON HOMES, INC., et al., Real Parties in Interest.

## COUNSEL

Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, Craig S. Simon, David B. Ezra and Catherine K. LaTempa for Petitioner.

No appearance for Respondent.

Stanzler, Funderburk & Castellon, Jordan S. Stanzler and Dennis G. Rolstad for Real Parties in Interest.

## OPINION

**CROSKEY, Acting P. J.**—Petitioner, Continental Casualty Company (Continental), seeks a writ of mandate compelling the trial court to vacate its order determining that Continental owed a duty to defend a particular lawsuit filed against its insureds, the real parties in interest, Paragon Homes, Inc., and related individuals and entities.[1] Continental also seeks an order requiring the trial court to grant Continental's motion for summary judgment on Paragon's complaint against Continental for declaratory relief, breach of contract and breach of the implied covenant of good faith and fair dealing. These claims all arose out of Continental's refusal to provide a defense to

---

[1] In addition to Paragon Homes, Inc., the real parties in interest in these writ proceedings include Irwin E. Garfield, Brian Catalde, Paramar Partners, Victorville Associates, Simi Valley Associates, MVE/SECO 3 & 4 Associates and Perris Associates. To the extent that they had been formed and were engaged in construction activities during the relevant coverage period (October 2, 1986, to October 2, 1988), it appears that each of these individuals and entities was a named insured under the general liability policy issued by Continental that is the subject of the underlying action and out of which these writ proceedings arose. For the sake of simplicity and convenience, we will hereafter refer to all of these real parties in interest by the term "Paragon."

Paragon in certain litigation filed in 1994 against Paragon by FN Development Company (Alpha) and related entities.[2]

As we review this record, it is clear that FN Development was a partner or joint venturer with Paragon in a number of development and construction projects and the FN Development action was brought against Paragon to resolve certain economic disputes then existing, to dissolve their several business relationships and to provide an accounting of their mutual affairs.[3] One of the matters of financial dispute was the proper allocation of losses arising from construction defect claims asserted by purchasers of homes in several of the aforesaid development and construction projects. As we explain, the general liability policy issued by Continental did not cover any of the claims made by FN Development and thus Continental had no duty to provide a defense thereto. Therefore, the trial court should have denied Paragon's motion for a summary adjudication of Continental's defense duty and, instead, granted Continental's summary judgment motion. We will therefore issue a writ directing the trial court to take such action.

## Factual and Procedural Background[4]

Beginning in 1979, FN Development and Paragon entered into a partnership to construct residential and commercial properties. In pursuit of such partnership goals, the parties entered into numerous development management agreements (DMA's) to define and govern their respective rights and liabilities as to particular development projects.

---

[2]This underlying action was filed not only by FN Development Company (Alpha), but also by FN Development Company (Bravo) and FN Projects, Inc. All three of these related companies are California corporations and are subsidiaries of First Nationwide Financial Corporation, a Delaware corporation, which was also named as a party plaintiff. Again, for the sake of simplicity and convenience, we hereafter collectively refer to these entities by the term FN Development. The underlying action filed by FN Development will be referred to as the FN Development action.

[3]Because of the nature of the issues presented by Continental's writ petition, we have greatly simplified our description of the many complicated business relationships entered into by Paragon and FN Development (and the several entities that are a part of each) and, for convenience, simply characterize such multiple business relationships by the singular term "partnership." For our purposes, it is not necessary to include a detailed discussion of the nature and character of each of the several development projects in which they engaged or to make any distinctions between the various legal relationships that may have existed whether partnership, joint venture or otherwise. A detailed review of those relationships was set forth in the unpublished opinion of Division One of this district affirming in part and reversing in part the trial court's judgment in the underlying FN Development action (*FN Development Co. v. Paramar Partners* (Feb. 28, 2001, B123192)).

[4]The facts which we recite and upon which we rely are not in dispute and are disclosed by the documents filed by the parties in support of and in opposition to their competing motions for summary relief.

Although the partnership was, for a time, extremely successful, the ultimately poor performance of some of the development projects caused FN Development to decide to terminate its relationship with Paragon. The performance problems which caused FN Development so much distress arose, at least in part, from a number of construction defect claims made by purchasers of homes in several of the development projects built by the Paragon-FN Development partnership. These claims, many of which were manifested in litigation filed by such purchasers, are hereafter referred to generally as the construction defect claims.

In July 1994, FN Development sued Paragon seeking declaratory relief, dissolution of their joint ventures and an accounting.[5] The complaint explained that the parties had numerous disputes and disagreements over matters that have a material and significant affect on the development, construction, marketing and sale of the development projects.

The fourth count in the FN Development action was labeled "declaratory relief-liability for construction defects," and alleged that various homeowners that bought Paragon homes built under the DMA's had asserted claims for construction defects. FN Development sought a judicial declaration that Paragon was "wholly liable for any and all construction defects arising from any of the projects subject to the Paragon DMAs."[6] It also alleged that Paragon was obligated to contribute $3.225 million to a reserve for *future* construction defect liabilities.

---

[5]This is the FN Development action identified in footnote 2, *ante.* In its complaint, FN Development also alleged causes of action for breach of contract, breach of fiduciary duty, money had and received, constructive trust and malicious prosecution.

[6]Specifically, FN Development alleged the following in paragraphs 167, 168 and 169 (the Fourth Cause of Action) of its complaint:

"167. Actual controversies have arisen and now exist between [FN Development] and the Paragon Developers regarding which entities are liable under the Paragon DMAs and applicable law for any defects in the construction performed by or under the supervision of the Paragon Developers. Specifically, [FN Development] contend[s] that the Paragon Developers that are parties to each of the Paragon DMAs or who have guaranteed the obligations of the developer under such DMAs, are wholly responsible for any construction defects arising from any of the projects subject to such DMAs, whereas the Paragon Developers dispute this contention.

"168. [FN Development] desire[s] a judicial determination of [its] rights and duties and a declaration as to whether the Paragon Developers are wholly liable for any and all construction defects arising from any of the projects subject to the Paragon DMAs.

"169. A judicial declaration is necessary and appropriate at this time under the circumstances in order that [FN Development] may ascertain [its] rights and duties under each of the Paragon DMAs with regard to present and future construction defect claims arising from the projects under such DMAs."

Continental had previously issued a commercial general liability insurance policy to Paragon that also insured the Paragon/FN Development partnership[7] with an effective period of October 2, 1986, through October 2, 1988.[8] *The defense of the construction defect claims had been tendered to Continental and it had undertaken to defend and settle them.* Paragon, however, after being served with the FN Development action, also tendered the defense of that action to Continental on July 3, 1997. Paragon's tender of the defense of the FN Development action was just 27 days before it was scheduled to go to trial.[9] Continental ultimately denied coverage on December 17, 1997.[10]

Paragon responded by bringing this action against Continental (and a number of its other insurers) for defense and indemnity coverage on July 3, 1998. In its fourth amended complaint (filed in August 2000), Paragon alleged that it was insured under Continental's policy and that Continental had breached that policy by denying coverage for the FN Development action and refusing to provide a defense. Paragon further alleged that a jury trial had been held in the FN Development action in November 1997 and the construction defect claims were litigated in the sixth cause of action for

[7]The modified declarations page of Continental's policy included a long list of named insureds. It not only set forth the names of specific development project joint ventures or partnerships but also included an omnibus clause that provided: "Any joint venture, partnership or corporation in which Paragon Homes, Inc. and/or Irwin Garfield, as individual and/or Garfield Development, Inc., 3.G Enterprise, Inc., or any subsidiary thereof retains majority interest and/or assumes direct management and/or control." There is *no* contention made herein by Paragon that this clause did not extend to provide "named insured" status under Continental's policy to each of the business entities involved in the several development projects out of which the construction defect claims arose.

[8]The policy obligated Continental to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies . . . . This insurance applies only to 'bodily injury' and 'property damage' which occurs during the policy period. The 'bodily injury' and 'property damage' must be caused by an 'occurrence.' " "Property damage" was defined as *physical injury to tangible property*, including all resulting loss of use of that property." (Italics added.) "Occurrence" was defined as an *"accident*, including continuous or repeated exposure to substantially the same general harmful conditions." (Italics added.)

[9]This trial date was later continued until November 1997.

[10]In its letter rejecting Paragon's tender, Continental stated, in part: "In reviewing the causes of action as pled in [FN Development's] First Amended Complaint, it would appear the only cause of action which even remotely could trigger the duty of defense and/or indemnity is the Fourth Cause of Action, Declaratory Relief - Liability for Construction Defects. While the complaint references claims for construction defects and a judicial determination of responsibility for same, it is our opinion that neither the insuring agreement in Coverage A or Coverage B of the Commercial General Liability Coverage Form, CG 0001 (11-85) is triggered in this matter. [¶] Furthermore, the defective pipe conditions allegedly existing at the 'Mountain View East' development with project inception in November, 1990, would not be the subject of coverage under the Continental Casualty Company policy issued to Paragon Homes, Inc., with expiration date of October 2, 1988. [¶] In consideration of the above, we must respectfully decline to participate in the defense and/or indemnity of Paragon Homes, Inc. in the above-captioned litigation."

dissolution and accounting, instead of under the fourth count for declaratory relief;[11] Paragon had been held liable for 50 percent of the construction defect losses in the sum of $1,612,500.[12]

Continental moved for summary judgment, arguing that in its action FN Development was not seeking to recover for property damage, but rather was suing to dissolve its multiple business and partnership relationships with Paragon. Further, Continental argued that because the FN Development action sought to apportion profits and losses between business partners under the DMAs, there was no accidental conduct. In short, Continental argued that its policy simply did not provide any potential for coverage for the claims asserted in the FN Development action. Thus, it had no duty to provide Paragon with a defense.

At the same time, Paragon filed a motion for summary adjudication of Continental's duty to defend the FN Development action.[13] Paragon argued that Continental had a duty to provide a defense because (1) FN Development had alleged that Paragon was wholly liable for the construction defect claims; (2) Continental was aware of these claims as it had already accepted their defense on behalf of the Paragon-FN Development partnership; and (3) the FN Development action essentially sought indemnity or contribution for construction defect losses. Therefore, Continental had a duty to defend. Paragon claimed approximately $10 million in defense costs.

The trial court agreed with Paragon, denied Continental's motion for summary judgment and granted Paragon's motion for summary adjudication.

---

[11]FN Development's Fourth Cause of Action for declaratory relief had previously been dismissed pursuant to a stipulation.

[12]In its pleading, Paragon alleged that "[w]ith respect to the construction defect claims, a stipulation was entered into after trial dismissing those claims asserted in the Fourth Cause of Action. However, with respect to the Sixth Cause of Action, it was determined that the Paragon entities owed to the FN entities $1,612,500.00 for liability for damage resulting from construction defects. The FN entities were permitted to introduce at trial the fact of pending construction defect litigation against plaintiffs and the FN entities, and evidence of proof of actual construction defects. As a result, an element of damages for such construction defects was included in the judgment against MVE/SECO 3 & 4 Associates and plaintiffs were found to be obligated for 50% of a $3,225,000.00 *loss attributable* to construction defects, or $1,612,500." (Italics added.)

It thus appears, from Paragon's own allegations, that FN Development's efforts to hold Paragon *solely* liable for the construction defect claims failed. We assume that the apparent equal division of the burden (after the cognizable amount was first determined as a part of the accounting process) resulted from either the provisions of the parties' several agreements or the application of general partnership law principles.

[13]We note that, according to the declaration of Paragon's counsel filed in support of its motion for summary adjudication, all but one of Paragon's other primary insurers had agreed to defend the FN Development action.

Citing *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229] (*Vandenberg*) and *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*), the trial court held that coverage obligations may arise from contractual obligations and that a legal obligation to pay may arise from a cause of action asserting equitable relief (e.g., an action for declaratory relief or for partnership dissolution and accounting). The court further found: "In this case there is no question that the construction defects for which FN sought a declaration placing liability on Paragon were property damage within the meaning of the policy. [Continental] in fact assumed the defense of the homeowners' direct action against Paragon. . . . [¶] The lawsuit by FN against Paragon was a partnership action, but the fourth cause of action sought a declaration of liability for the costs of any construction defects for which FN would be held liable . . . . It does not matter that the word 'indemnity' was not used. The FN suit sought to make Paragon legally liable to pay the cost of the property damage to the homeowners. [¶] The fact that the specific relief sought was declaratory does not vitiate coverage. [¶] And the question is, 'good heavens, are the insurers now going to have to get involved in partnership dissolution actions?' I think the answer to that is, 'yes.' That's the way I read the cases. . . ."

A notice of the December 11, 2000 ruling was mailed on December 22, 2000. Continental filed a timely petition for writ relief. On February 28, 2001, we issued an order to show cause, stayed all further proceedings in the trial court, and set the matter on calendar for argument.

## CONTENTIONS

Continental argues that there is no coverage, under the policy it issued to the Paragon-FN Development partnership, for claims asserted by one partner against the other arising from a dispute as to the respective liability of the partners for actual or potential partnership debts or losses. The FN Development action, at least as is relevant to the coverage issue, seeks to impose the entire liability for all construction defect claims upon Paragon. To the extent that there is coverage for such claims under Continental's policy, Continental is already providing a defense. To the extent that such claims are not covered by liability insurance, then they become partnership obligations which must be shared or allocated between the partners as provided in their several partnership agreements or under relevant principles of law. That, however, is not a claim or dispute for which coverage is provided under the partnership's general liability policy.

Paragon responds by arguing that the disputed liabilities all arise from the construction defect claims, the existence of which led FN Development to its

decision to end the partnership relation with Paragon, and Continental has already conceded that such claims (or at least many of them) are covered under its policy. Since FN Development is doing nothing more than asserting a claim of liability for covered claims, Paragon is entitled to a defense. The fact that the assertion of FN Development's claim of liability is based on contract (the partnership agreements) cannot preclude Paragon's entitlement to coverage, given the principles recently articulated by the Supreme Court in *Vandenberg, supra,* 21 Cal.4th 815. As already noted, the trial court agreed with this position.

We, however, come down on the side of Continental. As we explain, Paragon's argument would turn basic insurance principles on their head and is based on a misapplication of *AIU* and a misunderstanding of *Vandenberg.* We therefore will grant the requested writ relief.

## DISCUSSION

### 1. *Standard of Review*

This writ comes to us after the trial court denied Continental's motion for summary judgment. ■ The purpose of such a motion is to expedite litigation and eliminate needless trials. (*Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 323 [39 Cal.Rptr.2d 296].) It must be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Villa v. McFerren, supra,* 35 Cal.App.4th at p. 741.)

Where the facts are undisputed, the court can resolve the question of law in accordance with general summary judgment principles. (*Adams v. Paul* (1995) 11 Cal.4th 583, 592 [46 Cal.Rptr.2d 594, 904 P.2d 1205].) "Absent a *factual* dispute as to the meaning of policy language, which we do not have here, the interpretation, construction and application of an insurance contract is strictly an issue of law." (*Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 125 [49 Cal.Rptr.2d 567].)

■ A liability insurer's duty to defend will arise when a suit against an insured *potentially* seeks damages within the coverage of the policy. (*LaJolla Beach & Tennis Club Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 43 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) An insurer, however, need not defend

if the third party complaint cannot by any conceivable theory raise a single issue which would bring it within policy coverage. (*Id.* at p. 43.) Thus, the settled rule is that where a pleading against the insured raises the *potential* for coverage, the insurer must provide a defense. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) In order to prevail on a motion for the summary adjudication of the duty to defend, "the insured need only show that the underlying claim *may* fall within policy coverage." (*Id.* at p. 300, italics added.) The critical test, however, is "whether the underlying action for which defense and indemnity is sought potentially seeks relief *within the coverage of the policy.* [Citation.]" (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra,* 9 Cal.4th at p. 44, original italics omitted, italics added.) However, "[t]he duty to defend depends on whether there is potential liability based on the *facts* pled in the complaint or [otherwise] known to the insurer. There is no duty 'where the only potential for liability turns on a resolution of a legal question . . . .' [Citation.]" (*McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1151 [29 Cal.Rptr.2d 559].)

As we now discuss, the facts pled in Paragon's complaint, as well as the undisputed facts reflected in the record before us, provide no legal basis for a viable claim of coverage under Continental's policy. Continental, having already provided a defense for the construction defect claims as to which a potential for coverage did exist, had no legal obligation to defend Paragon in FN Development's action seeking to allocate the burden of what are necessarily (vis-à-vis Continental) *uninsured* claims.

2.  *The FN Development Action Seeks to Enforce a Claim for Intangible Economic Interests, Not "Property Damage"*

■ In the present case, FN Development sued Paragon to recover economic losses resulting from the operation of their partnership business, not for property damage. It is settled that property damage coverage under a liability policy, such as the one issued here by Continental, extends only to physical injury to, or destruction or loss of use of, tangible property. "Damage for lost profits, loss of investment or other harm to one's economic interest constitute injuries to *intangible* property which by definition fall outside the scope of the policy. [Citation.]" (*McLaughlin v. National Union Fire Ins. Co., supra,* 23 Cal.App.4th at p. 1150, italics in original.) The FN Development action essentially sought to end the business relationship with Paragon and apportion profits and losses in accordance with their existing agreements. Nowhere in its complaint did FN Development allege that *it* had sustained property damage. Rather, it sought a declaration that Paragon was "wholly" liable for certain obligations incurred by the partnership, that

is, the construction defect claims. This is essentially a claim relating to the proper *apportionment of a partnership loss* between partners.

To put it more specifically, FN Development was seeking to hold Paragon responsible for Paragon's alleged share of partnership losses arising from the construction defect claims. For at least two reasons there was no *potential* for coverage. First, there was never a possibility that Paragon would be held liable to FN Development for causing *property damage* since no claim was made for physical injury to tangible property.

Second, and most significantly, the only asserted construction defect claims that would necessarily be involved in the FN Development action were those claims that were *not* covered under Continental's policy. As the trial court acknowledged (and Paragon does not dispute), all of the asserted construction defect claims that were potentially covered under Continental's policy were in fact already being defended by Continental. Thus, the real undisclosed rationale for Paragon's argument is that Continental had an indirect obligation to defend Paragon from claims that Continental had no obligation to defend when those same claims had been asserted directly by the injured third party homeowner claimants. To sanction Paragon's claim of coverage would be to impose on Continental a liability that it never agreed to assume.

In support of its argument that Continental did have a duty to defend claims asserted in the FN Development action, Paragon cites *Val's Painting & Drywall, Inc. v. Allstate Ins. Co.* (1975) 53 Cal.App.3d 576 [126 Cal.Rptr. 267] (*Val's Painting*). In *Val's Painting*, one of Val's employee's was injured when he fell from scaffolding rented by a third party vendor, Ray-Cron. Ray-Cron, which had required Val's to sign an indemnity agreement as a condition of the scaffolding rental, filed a cross-complaint against Val's alleging Val's was liable for any injury because (1) it was Val's negligence that resulted in the injuries, and (2) Val's indemnity agreement required it to indemnify Ray-Cron for any injury resulting from the use of the scaffolding.

Val's tendered the defense of the cross-complaint to its insurer under its comprehensive general liability insurance policy. The tender was denied. The appellate court concluded that two possible theories could be detected from the cross-complaint—implied and contractual indemnity. The court held that because the cross-complaint arose out of a suit for damages for bodily injury, *a risk which was of the nature and kind covered by the policy*, the insurer had a duty to defend even though ultimately it might not be liable to indemnify the insured. (*Val's Painting, supra,* 53 Cal.App.3d at 584.)

*Val's Painting* is instructive in teaching that a claim for indemnity may create the potential for coverage if the claim arose out of a suit for damages

for a risk of the nature and kind covered by the policy. Here, however, FN Development was not really seeking to enforce a claim of indemnity. It was attempting to allocate a partnership loss arising from the existence of construction defect claims which necessarily were *not* covered by any liability policy issued by Continental. The covered claims would not contribute to partnership losses; to the extent of Continental's policy limits, such claims were (or would be) necessarily settled or otherwise satisfied by Continental.

FN Development sought to impose this burden on Paragon through an action for a dissolution, an accounting and declaratory relief. Thus, in the present case, Paragon is essentially asking Continental to defend a dissolution action between partners simply because (at least some of) the partnership losses can be *traced back* to construction defect claims that homeowners were litigating against the partnership in other lawsuits. Continental, however, had already provided a defense to these suits, at least to the extent that they asserted construction defect claims that were actually or potentially covered under Continental's policy.[14] That, of course, was *not* the case in *Val's Painting.* The cross-complaint for indemnity in that case was simply the vehicle by which the injured third party's claim was asserted against the insured. The insured was thereby effectively brought into the injury action as another defendant and its insurer had a clear obligation to provide a defense. Obviously, these are not the circumstances before us.

Nonetheless, Paragon asserts FN Development's partnership claims created a *potential* for coverage because FN Development sought to hold Paragon liable for the economic consequences of property damage. For example, Paragon argues that FN Development settled some homeowner claims prior to the filing of the FN Development action, and then sought reimbursement for those payments.[15] We do not believe, however, that such allegations provide a legal basis for establishing coverage under Continental's policy. If Continental's policy actually covered such claims, then FN

---

[14]The record does not disclose any argument or contention by Paragon that Continental has failed or refused to provide a defense to any of the underlying construction defect claims asserted against the Paragon-FN Development partnership where a potential for coverage existed under the Continental policy. Nor does Paragon contend that Continental has refused to provide a defense to any such potentially covered claims that might be asserted in the future.

[15]As an example of just how misdirected Paragon's argument is, it concedes that the final judgment against it in the FN Development action includes a sum of money awarded to FN Development to reimburse settlement costs incurred to replace defective pipes at a project called Mountain View East. What Paragon does not say, however, is that construction on this project started in 1990—*two years after Continental's policy expired.* Indeed, there is some suggestion in the record that the entire amount attributable to construction defect claims that was included in the judgment against Paragon (see fn. 12, *ante*) arose from the Mountain View East project.

Development's claim for reimbursement should have been made directly to Continental. If Continental had *no* coverage exposure for such a direct claim, it must follow that a potential for coverage could not be created by the indirect assertion of that claim in a partnership lawsuit against Paragon. This conclusion is fully supported by case law.

In *Giddings v. Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213 [169 Cal.Rptr. 278], the insureds became embroiled in a series of lawsuits that arose out of their business relationships. The various litigants sought to recover for the reduced value of corporate holdings, misappropriation of corporate property, waste of corporate assets, and other related conduct. The policies at issue covered property damage. The court held that the policies did not afford coverage for intangible economic interests and thus there was no duty to defend or indemnify in connection with the various lawsuits because there was no property damage. The court further held that economic losses do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. (*Id.* at p. 219.)

*Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699 [48 Cal.Rptr.2d 368] reached a similar conclusion. *Ticor* involved underlying litigation between Technical Equities Corporation (TEC) and Ticor Title (Ticor). TEC alleged that Ticor had acted negligently in the preparation and recording of certain documents and thereby facilitated the scheme of certain TEC's directors and officers in a scheme to loot and defraud the company. (*Id.* at pp. 1702-1703.) Ticor sought coverage from its liability insurer by arguing that the allegations against Ticor included allegations that it had facilitated the looting, converting, and misappropriation of corporate assets including "real property and subsidiary manufacturing companies that produced rubber and metal products." (*Id.* at p 1710.) In rejecting Ticor's argument that the litigation should be viewed as a claim of property damage, the court emphasized that the underlying complaint did not suggest that TEC was seeking recovery for "loss of use of tangible corporate property." (*Id.* at p. 1712.) Instead, "the loss which the estate suffered at Ticor's hands was an *economic loss*—the plummet in TEC's value in the pernicious hands of Stern & Company." (*Ibid.*, italics added.)[16]

The Supreme Court has also recently endorsed this same proposition. *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1 [44 Cal.Rptr.2d 370,

---

[16]There are several other cases employing similar reasoning. In *Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149 [8 Cal.Rptr.2d 263], the Devins were sued for failing to disclose that a house was "sliding, slipping, settling, sinking, fracturing and buckling." (*Id.* at p. 1153.) The court refused to find that the lawsuit involved claims of damage to property. Instead, the court reasoned that the buyers of the home were alleging that the Devins had caused "a pecuniary loss—the lost fair market value of the house." (*Id.* at p. 1158.)

*American Internat. Bank v. Fidelity & Deposit Co.* (1996) 49 Cal.App.4th 1558 [57 Cal.Rptr.2d 567] provides another example. In that case, the court held that a general liability

900 P.2d 619], involved underlying litigation between business associates that decided to go their separate ways. The court determined that allegations based on various business and contract transgressions did not create any potential for coverage under the standard general liability policy. The court further held "the focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses, violation of antitrust laws or performance of contractual obligations." (*Id.* at p. 17.)

As the foregoing authorities demonstrate, in evaluating whether or not an insurance company has a duty to defend a particular lawsuit, California courts have consistently analyzed the nature of the transactions between the parties to the lawsuit. In this regard, when the fundamental nature of those transactions is economic, California courts have refused to find a duty to defend the lawsuit even though the litigation will encompass issues relating to property damage. For example, in *Miller v. Western General Agency, Inc.* (1996) 41 Cal.App.4th 1144 [49 Cal.Rptr.2d 55], the claimant sued the insured Millers in connection with the sale of their home. (*Id.* at p. 1147.) The claimant alleged that the Millers had failed to disclose the existence of defective plumbing that had subsequently failed and caused "damage to real and personal property." (*Id.* at p. 1148.)

The Millers asked their liability insurer to defend the claimant's lawsuit but the insurer refused. Ruling that there was no duty to defend, we held in *Miller* that "[t]he basis for . . . complaint is not the alleged defective plumbing, although it might otherwise have been a part of [the claimant's] damages. What they are suing for is the tortious fraudulent conduct of the Millers which simply does not fall within the coverage of Central-National's

insurer had no duty to defend a bank that was sued for allegedly mishandling a loan which caused the claimants to lose the use of property they had purchased at considerable expense. (*Id.* at p. 1562.) The court rejected the insured bank's effort to characterize the claims as property damage. Instead, the court found that there was no duty to defend because the bank had allegedly caused the claimants to suffer economic loss, not actual property damage. (*Id.* at p. 1572.)

Finally, in *Allstate Ins. Co. v. Interbank Financial Services* (1989) 215 Cal.App.3d 825 [264 Cal.Rptr. 25], the defendant *Interbank* allegedly gave bad advice with respect to certain tax shelter investments regarding thoroughbred racehorses. (*Id.* at p. 827.) It was sued by the investors, who alleged that they had been given improper advice and that Interbank had " 'failed to properly manage and care for the plaintiff's personal property,' " which had allegedly " 'been negligently and carelessly damaged.' " (*Id.* at p. 830.) The court refused to find that Interbank's liability insurer had a duty to defend the lawsuit. Instead of focusing on potential derivative harm to the racehorses, the court focused on the specific allegations of the lawsuit pertaining to bad investment advice. After identifying the fundamentally economic nature of the transaction, the court held that "although the insureds attempt to characterize the claims differently, the clear bases of the complaints are that the insureds gave poor professional advice and that the plaintiffs lost money in a tax shelter investment." (*Id.* at pp. 830-831.)

policy." (*Miller v. Western General Agency, Inc.*, *supra*, 41 Cal.App.4th at p. 1151.)

Just as in *Miller*, the basis of the FN Development action was not construction defect based liability. It was not asking the court to find that Paragon or anyone else had negligently damaged anyone's home.[17] Instead, FN Development and Paragon (through their several insurers, including Continental) were defending homeowners' construction defect lawsuits in other cases. In the FN Development action, FN Development asked the court to interpret the various agreements it and Paragon had executed over the years, and then render an appropriate accounting between them which allocated sole liability to Paragon for what necessarily had to be *uninsured* construction defect claims.

In addition, it is also clear that the FN Development action arose from the several financial and partnership transactions between FN Development and Paragon, not from an accident causing damage to FN Development property. (See *Safeco Ins. Co. of America v. Andrews* (9th Cir. 1990) 915 F.2d 500, 502 ["Although the defective condition of the property is an element of [the asserted] claims, the defects cannot, even when interpreting the policy broadly, be considered the *cause* of [the claimant's] damages. The cause of the damage was [the insured's] alleged misrepresentations, which are not an 'occurrence' or a 'peril insured against' under the terms of the policy"].) FN Development's action did not involve any occurrence or accident. To the contrary, it sought to dissolve the partnership in the face of irreconcilable economic differences with Paragon. Thus, by asking the court to interpret the various partnership documents, and then render an accounting, FN Development was seeking economic relief, not claiming property damage.

### 3. *Neither AIU Nor Vandenberg Supports Paragon's Position*

The trial court appears to have relied heavily on the Supreme Court's decisions in *AIU* and *Vandenberg* in arriving at its conclusion that a basis for

---

[17]Paragon makes much of the fact that FN Development was allowed to put on evidence concerning the construction defect claims during the trial of the accounting and dissolution cause of action. However, the record makes clear FN Development's purpose in tendering such evidence. It was because the *existence*, rather than the specific merits, of such litigation had an impact on the financial issues that the court was asked to address by FN Development's complaint. Such evidence provided a basis for FN Development's claimed right to terminate its agreements with Paragon and was relevant to the question of the market value of the various projects as well as the financial performance of, and the risks inherently involved in, those projects. As Paragon itself argued (in support of its motion in the trial court to dismiss FN Development's Fourth Cause of Action for declaratory relief), "This is a partnership fiduciary duty and accounting case, not a construction defect case." FN Development also emphasized that it "did *not* seek *damages* for claims of construction defects." Thus, we find the receipt of evidence concerning the existence and status of the construction defect claims in the FN Development action provides no support for Paragon's arguments here.

coverage existed under Continental's policy. We do not believe either of these cases supports the trial court's conclusion.

While it is true that the *AIU* court sanctioned a coverage claim for a suit *in equity* prosecuted against an insured, it does not follow that *AIU* would impose coverage in *every* equitable case. As already noted, Continental's policy promised coverage of a suit seeking sums "that the insured becomes *legally obligated* to pay *as damages* because of . . . *property damage*" (italics added) which occurs during the policy period and is *caused* by an *occurrence. AIU* held that equitable orders (e.g., mandatory injunctions and orders compelling reimbursement of cleanup costs to the government) requiring the cleanup and remediation of toxic pollution caused by an insured's business activities would constitute damages that an insured was legally obligated to pay. (*AIU, supra,* 51 Cal.3d at pp. 824-828, 833, 836-837, 840-841.) "Because California has generally abandoned the traditional distinction between courts of equity and courts of law [citations], even a legally sophisticated policyholder might not anticipate that the term 'legally obligated' precludes coverage of equitably compelled expenses." (*AIU, supra,* 51 Cal.3d at p. 825.) In short, the *AIU* court concluded that the phrase "legally obligated" meant "required of the insured," *whether at law or in equity.* (*Id.* at pp. 824-825; see also *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 62 [70 Cal.Rptr.2d 118, 948 P.2d 909].)

Thus, the cost of compliance with such court orders was insurable and was covered under the provisions of a general liability policy. Nothing in *AIU,* however, suggests that the claim asserted against an insured still did not have to arise from *property damage* sustained by the claimant during the policy period which was caused by an occurrence (i.e., an *accident* or continued or repeated exposure to harmful conditions). In other words, reliance on the principles articulated in *AIU* does nothing more than beg the question of whether *a covered claim for property damage* has been asserted. It certainly does not answer it. Given general coverage principles, *AIU* provides no assistance to Paragon.

The same conclusion applies to the *Vandenberg* decision. In that case, the Supreme Court specifically discussed the term "legally obligated to pay as damages" as that phrase is used in a general liability policy. It did so in the context of a liability insurer's denial of coverage for damages awarded against an insured on the ground that the damages were assessed on a *contractual* theory. The insurer, citing a number of Court of Appeal decisions, had argued that the phrase "legally obligated to pay as damages" referred only to a liability based upon a breach of duty imposed by law, that is, based on *tort* not on contract.

The insured in *Vandenberg* was held liable for the breach of a long-term real property lease based on the contamination of soils located on the leased property and the underlying groundwater.[18] The court held, however, that whether the third party's claim was based on tort or contract was not the proper question. Rather, it was the *"nature of the damage and the risk involved,* in light of particular policy provisions, [which would] control coverage." (*Vandenberg, supra,* 21 Cal.4th at p. 839, italics added.) The court specifically rejected the proposition that the phrase " 'legally obligated to pay' " necessarily excluded coverage for liability arising from a breach of contract. (*Ibid.*) "This phrase had usually been construed to mean *liability imposed in a definite sum by a final judgment* against the assured. [Citation.]" (*Ibid.,* italics added.) To conclude, however, that such phrase could only refer to a tort claim asserted against the insured would ignore settled principles of insurance contract interpretation. (*Ibid.*)

*Vandenberg* applied that principle: "A reasonable layperson would certainly understand 'legally obligated to pay' to refer to any obligation which is binding and enforceable under the law, whether pursuant to contract or tort liability. Further, a reasonable layperson, cognizant that he or she is purchasing a 'general liability' insurance policy, would not conclude such coverage term only refers to liability pled in tort, and thus entirely excludes liability pled on a theory of breach of contract. Under general insurance principles, we must interpret the phrase 'legally obligated to pay as damages' in accordance with the ordinary and popular sense, not the legalistic, and erroneously premised, interpretation of the language urged by insurers." (*Vandenberg, supra,* 21 Cal.4th at p. 840.)

Quoting several commentators with approval, the *Vandenberg* court concluded, " '[W]hether a particular claim falls within the coverage afforded by a liability policy is not affected by the form of the legal proceeding. Accordingly, the legal theory asserted by the claimant is immaterial to the determination of whether the risk is covered.' [Citation.] . . . 'The expression "legally obligated" connotes legal responsibility that is *broad* in scope. It is directed at civil liability . . . [which] can arise from either unintentional (negligent) or intentional tort, under common law, statute, or contract.' [Citation.] . . . 'The coverage agreement [which] embraces "all sums which the insured shall become legally obligated to pay as damages . . . ." . . . is intentionally broad enough to include the insured's obligation to pay damages for breach of contract as well as for tort, within limitations imposed by

---

· [18]In *Vandenberg,* the lessor had alleged, and an arbitrator had subsequently held, that the lessee's improper installation, maintenance and use of waste oil storage tanks on the leased property had caused the contamination of soils and groundwater and the lessee's acts constituted a breach of the lease agreements. A $4 million award by the arbitrator was subsequently confirmed by the judgment of the superior court.

other terms of the coverage agreement (e.g. bodily injury and property damage as defined, caused by an occurrence) and by the exclusions . . . .' [Citation.]" (*Vandenberg, supra,* 21 Cal.4th at p. 841, italics in original.)

*Vandenberg* said no more than whatever the interpretation to be given to the term "legally obligated," it must be broad enough to include "damages for breach of contract as well as for tort." (*Vandenberg, supra,* 21 Cal.4th at p. 841.) The court was only making the simple point that it was not the "form of the proceeding" (*ibid.*) that would control coverage, but rather that the issue would be resolved by a determination as to whether the acts of the insured had created a *risk covered under the policy* which resulted in either bodily injury or *property damage to another.* If those requirements were satisfied, it would not matter that the third party claimant's theory of recovery was based on contract rather than on tort.

Given this understanding of *Vandenberg,* we can only conclude that it likewise provides no support for Paragon's argument for coverage. It is not that FN Development's claim was based on contract (i.e., the several partnership agreements) which precludes coverage, but rather the failure of the complaint in the FN Development action to seek *damages* for *property damage* caused by an *occurrence.*

### DISPOSITION

The order to show cause is discharged. A peremptory writ of mandate shall issue directing the trial court to vacate its order of December 11, 2000, granting Paragon's motion for summary adjudication and denying Continental's motion for summary judgment and to enter a new order denying Paragon's motion and granting summary judgment in favor of Continental. The stay of trial court proceedings heretofore issued shall be lifted on the date the remittitur is issued herein. Continental shall recover its costs in these writ proceedings.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied October 12, 2001, and the petition of real parties in interest for review by the Supreme Court was denied December 12, 2001.