Filed 9/30/14  Kleege v. SSIC, LLC CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| R. BRUCE KLEEGE, | D064077 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2009-00068303- CU-BC-EC) |
| SSIC, LLC, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Sparber Annen Morris & Gabriel and Richard J. Annen for Defendant and Appellant.

Thornton Koller, Audrey Powers Thornton; Taylor and White and Walter A. Taylor for Plaintiff and Respondent.

SSIC, LLC (SSIC)  appeals a portion of a judgment confirming an arbitration award in its favor allowing it to keep a $500,000 deposit paid by R. Bruce Kleege toward the purchase of commercial real property.  SSIC asserts the arbitrator exceeded his

powers because, in making the award, the arbitrator disregarded the plain language of the purchase contract. (See Code Civ. Proc.,[1] § 1286.2, subd. (a)(4).) However, in making its argument, SSIC fails to disclose that the arbitrator found that it had breached portions of the contract. In addition, the arbitrator provided a very thorough, written final award with a statement of findings and facts. This award explains in great detail why the arbitrator limited the award as he did. The arbitrator's award thus "bear[s] some rational relationship to the contract and the breach." (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 381 (*Advanced Micro Devices*).) The arbitrator did not exceed his powers. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

The dispute between SSIC and Kleege arises out of a failed real estate purchase. James and Ruth Shafer (together Shafer) operated a mobile home park and nudist resort on certain real property (property) that was damaged in the 2003 San Diego County wildfires. To rebuild the park, Shafer and SSIC (which was owned by Shafer) entered into a series of transactions with Jack Murphy & Associates (JMA). JMA provided rebuilding and repair construction services to the property and also gave significant financing for the improvements and the placement of new mobile homes on the property.

---

[1] Statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] The facts stated are taken primarily from the arbitrator's final award and statement of findings and facts. A court may not review for sufficiency the evidence supporting an arbitrator's award. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 (*Moncharsh*).) We therefore take the arbitrator's findings as correct without examining a record of the arbitration hearings themselves. Indeed, the record before us contains neither a reporter's transcript of the hearing nor all the exhibits introduced during the hearing.

2

Shafer and SSIC ran into difficulties in operating the mobile home park, and ultimately entered into a contract to sell the interests in SSIC to Gonzalez Goldby & Taft (GGT). As part of that proposed sale, SSIC received a note in the amount of $725,000 as well as a deed of trust encumbering the property.

GGT defaulted and Shafer regained management of the property and ownership of SSIC. At that time, JMA filed a judicial foreclosure action with regard to its secured debt recorded against the property.

The relationship between SSIC and Shafer on the one hand, and JMA on the other hand was acerbic, resulting in protracted litigation and legal maneuvering. As a consequence, Shafer and SSIC were in dire financial straits and could not continue to operate the mobile home park. Shafer and SSIC wanted to sell the property to a third party who could take over the property, run the mobile home park at a profit, and relieve SSIC from its debts (primarily owed to JMA).

Shafer and SSIC worked with David Rogers, a sales agent with Marcus & Millichap Real Estate Investments Services, Inc. (M&M), to find buyers. Rogers also advanced Shafer $100,000 to cure defaults that JMA claimed. Rogers received an unsecured promissory note in exchange for the advance.

In addition to obtaining offers from third party buyers, Rogers brought the property to Kleege's attention. Rogers and Kleege previously worked on a transaction together. SSIC and M&M entered into a listing agreement whereby M&M became the listing broker for the sale of the property.

3

Rogers also was interested in becoming an owner of the property or partner in any entity that acquired the property. To this end, Rogers and Kleege submitted an offer to purchase the property, including the mobile homes on the property. Rogers negotiated the purchase terms and presented them to Kleege. Rogers and Kleege did not enter into a formal partnership agreement, but they agreed that Rogers would receive 20 percent interest in the property in exchange for forgiving any repayment of the $100,000 he advanced to the Shafers and as compensation for services provided and to be provided in connection with the acquisition of the property and operation of the mobile home park.

SSIC accepted Rogers and Kleege's purchase offer and entered into an agreement consisting of a purchase and sale agreement and a lease and maintenance agreement (Agreement). At the time the parties executed the Agreement, some of its exhibits had not been completed and attached to it.

The Agreement contained a liquidated damages clause, stating that if the buyer defaulted on the purchase obligations, the seller was entitled to retain the buyer's deposit as liquidated damages, "which shall be [the seller's] sole and exclusive remedy in law or equity for [the buyer's] default." The Agreement also included an arbitration clause, requiring the parties to arbitrate a controversy that "arise[s] with respect to the subject matter of this . . . Agreement . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association."

In addition, the Agreement contained certain representations regarding liens on the property based on SSIC's debt. For example, the Agreement stated a note in favor of JMA was not to exceed $3,250,000 with no payments due until August 2009, at which

4

time the entire amount was due. In addition, the Agreement disclosed the existence of two other notes, one of which was not to exceed $550,000 and the second was not to exceed $200,000.

The parties also executed an addendum to the Agreement (Addendum) that expressly stated, "To the extent any provision of this Addendum conflicts with any provision of the Agreement, this Addendum will supercede [sic] the Agreement." The Addendum included Rogers along with Kleege within the definition of "Buyer." The Addendum provided that the buyer would acquire certain manufactured (or mobile) homes described in an exhibit. It also set forth that the manufactured homes were to be acquired from JMA and subject to contractual provisions between JMA and SSIC. It also acknowledged that a portion of the sales price of each mobile home would have to be paid to JMA.

The Addendum required a deposit of $600,000 to be paid by the buyer, consisting of the $100,000 previously advanced by Rogers and $500,000 to be wired to the seller by Kleege no later than June 1, 2008. Further, if Kleege wired the $500,000 by June 1, 2008, then Kleege and Rogers would waive all contingencies of the Agreement and the deposit would become nonrefundable. After making that deposit, the Addendum stated that the buyer would be an independent operator of the mobile home park under the lease and maintenance agreement.

The Addendum provided that on or before May 31, 2008, the seller would resolve to the buyer's satisfaction any issues regarding property taxes and pay any portion of the

5

secured debts on the property to the extent the principal balance of any such debts exceeded $4,400,000.

The Addendum also addressed the issues of breach and damages:

> "Buyer hereby agrees to provide written notice to Seller at least six months prior to the Closing Date, in the event Buyer decides not to consummate the transaction for any reason. Upon such notice, the Purchase Contract shall terminate (except for the terms of the lease), and Seller shall retain the Deposit, unless otherwise required to be returned pursuant to the Purchase Contract. In the event Buyer does not provide such notice, Buyer shall be obligated to close and Seller shall be entitled all remedies and damages allowed by law (unless Seller breaches the Purchase Contract)."

The lease and maintenance agreement, signed by the parties, contained an acknowledgement by the parties that the property was subject to "separate secured debt" owed to three lenders, including JMA, in an amount that was not to exceed $4,400,000. In addition, the lease and maintenance agreement stated that JMA "claimed that [SSIC] failed to pay certain property taxes and to keep the other [s]ecured [d]ebt current and therefore was in default. [SSIC] hereby represents and warrants that it has cured the stated defaults."

Kleege wired $500,000 to escrow per the Addendum prior to the June 1, 2008 deadline. Near to that time, Shafer, on behalf of SSIC, provided a list of the mobile homes to be sold. This list included 14 mobile homes. Upon the wiring of the $500,000, Kleege and Rogers did not acquire title to the property, but they proceeded to manage the mobile home park under the lease and maintenance agreement.

Shortly after wiring the deposit, substantial disputes arose between SSIC on one hand and Kleege and Rogers on the other. Kleege raised issues regarding the number of

6

mobile homes to be transferred under the Agreement, alleged misrepresentations regarding debt structure on the property, and other issues. And over the course of the next few months, additional disputes arose regarding whether Kleege and Rogers would pay debt service obligations on some of the notes SSIC owed. Also, Kleege and Rogers refused to pay any rent or advisory fee payments to SSIC as required by the lease and maintenance agreement.

Despite these disagreements, the parties tried to move forward to close the transaction. To this end, Kleege, who started acting without Rogers, worked with SSIC to negotiate with JMA to address JMA's issues regarding title to mobile homes and debt SSIC owed. Kleege also took possession of the mobile home park, collected rent, paid expenses, and treated the mobile home park as if he owned it. However, Kleege did not provide any accounting or other information to SSIC.

Meanwhile, more disputes arose regarding debt owed to other creditors in addition to JMA. There also existed disagreement regarding the removal of JMA occupied mobile homes from the property, payment obligations owed to JMA for the mobile homes, and the marketing of mobile homes.

During this time, SSIC and JMA continued to litigate their disputes, trying to resolve whether: (1) SSIC had cured its defaults, (2) the court should appoint a receiver for the property; and (3) the judicial foreclosure action should be dismissed. Ultimately, SSIC and JMA settled their litigation and the payoff amount for JMA's note was established.

Less than a week prior to the date the purchase was to close, Kleege filed suit against various parties, including SSIC, Shafer, and Rogers. SSIC successfully petitioned the superior court to compel arbitration.[3]

In arbitration, Kleege sought return of his $500,000 deposit from SSIC on several grounds, including misrepresentations regarding the number of mobile homes involved in the sale, SSIC's default on its obligations to JMA and the status of the SSIC/JMA litigation, and the amount of debt on the property. The arbitrator denied Kleege's claim, finding that he could not recoup his deposit when he stayed in the transaction and "reaped the benefits and burdens of the entirety of the transaction."[4]

SSIC asserted numerous claims against Kleege based on Kleege's alleged breach of the Agreement, specifically the Addendum and the lease and maintenance agreement. The arbitrator noted SSIC had received the deposit consistent with the liquidated damages provision of the Agreement.

The arbitrator acknowledged that SSIC sought additional damages under a provision of the Addendum, entitling it to contractual damages if Kleege did not complete the purchase. However, the arbitrator found that "SSIC cannot accept the retention of liquidated damages, and still seek additional damages."

---

[3]    The record indicates that JMA foreclosed on the property sometime after Kleege filed suit.

[4]    The arbitrator also denied Kleege any recovery for his claims against Rogers and M&M. Because those claims are not relevant to the issues raised in this appeal, we omit any discussion of them.

8

The arbitrator explained in great detail why he found Kleege's alleged breaches under the lease and maintenance agreement did not warrant additional damages in SSIC's favor. Because the arbitrator's explanation so clearly sets out his reasoning in denying SSIC additional damages, we take the unusual step of repeating the portion of the arbitrator's findings related to the SSIC's claims of breach:

"Based on a review of the lease and maintenance agreement, and after considering the testimony of the parties, and all of the documentary evidence, the arbitrator finds that seller/lessor was in breach of the lease and maintenance agreement as of the date that it became effective. Recital D of the lease and maintenance agreement provides, 'Lessor hereby represents and warrants that it has cured the stated defaults.'

"As noted above, this was not an accurate representation. The true facts were that there was a significant dispute between the seller and JMA, with regard to whether or not the defaults had been cured. Seller's counsel believed that the tender which it had undertaken on behalf of SSIC constituted a cure of all stated defaults. However, there is no question that at the time the representation was made, JMA had communicated to the attorneys that it did not share that belief. In addition, the seller failed to disclose that the JMA obligations did provide for interim payments upon the occurrence of certain events (i.e., the sales and marketing of the mobile homes).

"This issue was a central aspect of the entire transaction. There is no question that Mr. Kleege paid some of the obligations that became due and owing during the terms of the lease and maintenance agreement, and failed to pay others. Most notably, Mr. Kleege, failed to pay any of the sums due to SSIC or the Shafers with regard to advisory

9

fees or rent. The lease and maintenance agreement provided a notice and cure protocol and the right to terminate the lease upon the default of Mr. Kleege.

"It is apparent from a review of the totality of the evidence, that SSIC and Shafer hoped to keep Mr. Kleege 'married' to the deal, so that he would actually consummate the purchase of the park and relieve SSIC and Shafers of all obligations and problems in connection with the mobile home park. Mr. Kleege, at the same time, rather than unequivocally terminating the agreement based on the JMA issues and some of the other alleged issues, agreed to perform some portions of the lease and maintenance agreement when it was expedient for him to do so, and ignored other portions of the agreement.

"It appears that each of the parties was willing to put up with the 'breaches' by the other party to see how the transaction would ultimately play out.

"In reality, Mr. Kleege paid $500,000 for the right to attempt to negotiate a purchase of the mobile home park acceptable to him (whether or not that involved SSIC and the Shafers or simply a direct transaction with JMA).

"On the other hand, SSIC was already in dire straits, and based on all of the issues that arose at the property, was not in a position to remarket the property to any third party. As such, SSIC voluntarily allowed the lease and maintenance agreement to proceed forward in the hopes that as some point a transaction would be consummated, and the Shafers and SSIC would be relieved of their many liabilities.'"

The arbitrator also found that there was no prevailing party regarding claims made by Kleege and/or SSIC.[5]

SSIC petitioned the superior court to confirm the arbitration award as to the denial of claims asserted by Kleege against SSIC and Shafer and vacate the award as to claims asserted by SSIC against Kleege and Rogers and order a new arbitration. Kleege opposed the petition to the extent it sought to vacate the award as to SSIC's claims.

The superior court denied SSIC's petition to vacate the award and entered an order to confirm the arbitration award.

After some procedural missteps, the parties obtained a judgment on the order. SSIC timely appealed.[6]

## DISCUSSION

Judicial review of a petition to vacate an arbitration award in both the trial court and on appeal is limited to the statutory grounds found in section 1286.2. (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 981-982.) The reason for such limited judicial review is that an "arbitration decision is final and conclusive because the parties have agreed that it be so." (*Moncharsh*, *supra*, 3 Cal.4th at p. 10; italics omitted.) Arbitration by agreement is often a "process in which parties voluntarily trade the safeguards and formalities of court litigation for an expeditious, sometimes roughshod means of resolving their

---

[5] SSIC also brought claims against Rogers and M&M. The arbitrator denied any recovery on those claims.

[6] It appears Rogers was served with a notice of appeal. However, he never made an appearance in this matter.

11

dispute." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 831.)  Because "arbitral finality is a core component of the parties' agreement to submit to arbitration" (*Moncharsh*, *supra*, at p. 10), and as arbitrators are not required to make decisions according to the rule of law, parties to an arbitration agreement accept the risk of arbitrator errors (*id.* at p. 12), and arbitrator decisions cannot be judicially reviewed for errors of fact or law even if the error is apparent and causes substantial injustice (*id.* at pp. 11, 33; see *Vandenberg*, *supra*, at p. 832).  " 'As a consequence, arbitration awards are generally immune from judicial review.' "  (*Moncharsh*, *supra*, at p. 11.)

Therefore, the authority of the courts to vacate an arbitration award is limited by statute.  Courts may vacate an award only when:  (1) the award was procured by corruption, fraud, or other undue means; (2) an arbitrator was corrupt; (3) misconduct of the arbitrator substantially prejudiced a party's rights; (4) the arbitrator exceeded his or her powers; (5) an arbitrator's refusal to postpone the hearing or hear material evidence substantially prejudiced the rights of a party; or (6) an arbitrator failed to disclose a ground for disqualification or improperly failed to disqualify himself or herself. (§ 1286.2, subd. (a).)  Here, we focus on the fourth justification allowing a court to vacate an arbitration award.

SSIC contends the arbitrator exceeded his power because he disregarded the plain language of the Addendum when he did not award SSIC the remaining amount due on the purchase price.  SSIC reasons that to the extent the Addendum and the Agreement were in conflict, the Addendum controlled.  The Addendum required Kleege to complete the purchase if he did not provide six-months' notice that he was cancelling the

transaction prior to the closing of the sale. The Agreement contained a liquidated damages clause allowing SSIC to retain the deposit if Kleege breached the Agreement. SSIC argues that the Addendum makes clear that its damages were not limited to retention of the deposit, but instead, the arbitrator was required to award SSIC the remainder of the purchase price because the parties had agreed to that specific remedy as set forth in the Addendum.

Essentially, SSIC contends the Agreement (as modified by the Addendum) was unambiguous, susceptible to only one interpretation, provided for a specific remedy, and the arbitrator had no discretion to award any other remedy when it found that Kleege failed to provide six-months' notice that he was not going to complete the transaction. Based on this contention, SSIC insists "the arbitrator disregarded every principle of contract construction which has existed for over 140 years of codified law in California" and "disregarded the parties' agreement based on that law."

SSIC thus is challenging the arbitrator's choice of remedies. Our high court provided "a meaningful, workable and properly deferential framework for reviewing an arbitrator's choice of remedies." (*Advanced Micro Devices*, *supra*, 9 Cal.4th at p. 381.) The court explained:

> "Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.] The remedy awarded, however, must bear some rational relationship to the contract and the breach. The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent.

13

[Citation.] The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator). Where the damage is difficult to determine or measure, the arbitrator enjoys correspondingly broader discretion to fashion a remedy. [Citation.] [¶] The award will be upheld so long as it was even arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source." (*Ibid.;* original italics; fn. omitted.)

The arbitrator's award allowing SSIC to retain the deposit it received (including the $500,000 from Kleege) did not exceed the arbitrator's power under the applicable standard. The relief awarded was rationally drawn from the arbitrator's conception of the Agreement's subject matter and the effects of the breaches by Kleege and SSIC as well as their relationship under the Agreement. The arbitrator explicitly detailed how he viewed the parties' behavior under the Agreement, including the Addendum and the lease and maintenance agreement, concluding: "It appears that each of the parties was willing to put up with the 'breaches' by the other party to see how the transaction would ultimately play out." Thus, Kleege paid $500,000 for the opportunity to negotiate a purchase of the mobile home park from SSIC, or JMA, which had a sizable lien on the property and at least some ownership interest in the mobile homes. SSIC wanted to keep Kleege "married" to the deal so he would complete the purchase and relieve SSIC and Shafer of their many liabilities. Moreover, SSIC utterly ignores (almost to the point of disingenuousness) that the arbitrator found that it was in breach of the Agreement. The arbitrator's final award makes clear that SSIC and JMA significantly disputed: (1) the amount SSIC owed JMA, (2) whether SSIC was in default on its obligations to JMA, and (3) if JMA could judicially foreclose on the property. Moreover, from the available facts,

14

it does not appear that SSIC fully disclosed the extent of its dispute with JMA and misrepresented the status of the obligations it owed JMA.

As such, the arbitrator would not allow Kleege to rescind the Agreement and receive his $500,000 deposit. Nor would the arbitrator award SSIC any additional damages because of its breaches of the Agreement and misrepresentations regarding JMA. These facts do not compel the conclusion that "the arbitrator fashioned a remedy by reaching outside the contract to some extrinsic source." (*Advanced Micro Devices*, *supra*, 9 Cal.4th at p. 384.) To the contrary, the arbitrator deftly and fairly addressed a proposed transaction that appeared to be doomed from the beginning. This is not a case where an arbitrator exceeded his power. Instead, it is an example of a party to an arbitration arguing an arbitrator made an error of fact and/or law. As such, judicial review of the arbitrator's award is improper. (*Moncharsh*, *supra*, 3 Cal.4th at p. 11.)

## DISPOSITION

The judgment is affirmed. Kleege is awarded his costs on appeal.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

15