Filed 6/28/22  P. v. Dominguez CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PRUDENCIO DOMINGUEZ,<br><br>    Defendant and Appellant. | B304659<br><br>(Los Angeles County<br>Super. Ct. No. BA208008) |

APPEAL from an order of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Reversed and remanded.

Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Prudencio Dominguez appeals from an order summarily denying, without appointing counsel, his petition for resentencing under Penal Code section 1170.95.[1] For the reasons set forth below, we reverse the order and remand for further proceedings.

**BACKGROUND**

**A.  *Dominguez***

Dominguez was tried three times for a shooting that resulted in one death and two injuries, the first two trials resulting in mistrials and the third in a 2002 conviction that we affirmed in 2003. (*People v. Prudencio Dominguez* (Nov. 19, 2003, B159705) [nonpub. opn.] (*Dominguez*).)

In *Dominguez*, we set forth the facts as follows:

"In 1995, Alonzo Ramirez (one of the attempted murder victims) moved with his wife and three children to a house on Tremont Street within the territory claimed by "Big Hazard" (a mostly Hispanic street gang) and marked by its graffiti. Ramirez saw gang members on the street almost everyday, including Dominguez (a tattooed member of Big Hazard). Ramirez's eldest son joined a rival gang, "Krazy Ass Mexicans," and moved out of the house—but visited his parents at their home, conduct which was viewed by Big Hazard's members as a sign of disrespect to their gang.

"On August 20, 2000, someone broke the alley-side windows of Ramirez's house. Ramirez ran to the alley, saw 'Malo' and 'Dreamer' (both Big Hazard members) laughing and heading toward the Ramona Gardens Housing Project (the center of Big Hazard's territory). Ramirez asked them why they had broken his windows. Dreamer said they 'felt like it,' and asked, 'So

_____

[1] Undesignated statutory references will be to the Penal Code.

2

what's up with you, you old man?' Dreamer then punched Ramirez and the three men fought. Neighbors, including other Big Hazard members, came out and watched. Ultimately, Malo and Dreamer ran off, with Dreamer telling Ramirez, 'We're going to fuck you up.' Other Big Hazard members made similar comments.

"The police responded to a call about the fight. Ramirez, afraid that Big Hazard members walking by when the police arrived might consider him a 'rat,' told the officers there was 'nothing . . . going on.' After the police left, Ramirez left with his wife and younger children. When he returned that night, a nervous neighbor told Ramirez that men with covered faces had shot at the house, and Ramirez saw bullet holes all over the house. One of the neighbors collected the bullets and later gave a bag of expended .22- and .45- caliber casings to the police. Ramirez moved his family out of the house but he returned. Three to five times over the course of the next few days, Ramirez saw Dominguez drive by in a burgundy Chevrolet Astro van, stopping each time at Ramirez's driveway. Dominguez looked angry.

"On August 31, Ramirez was working in his driveway on Roberto Bedolla's car, talking to Bedolla and another man (Miguel Pantoja) as he worked. That afternoon, Ramirez twice saw Dominguez drive slowly by the house. Immediately after Dominguez's second pass by the house, two armed men with handkerchiefs over their faces came toward Ramirez, who yelled to his friends to 'watch out' because 'these guys are coming . . . to kill me.' Pantoja ran for cover as one gunman approached Bedolla and the other chased Ramirez, shooting all the while. Three bullets struck Ramirez, and the gunman then went after

Pantoja and shot at him several times. One gunman said, 'Let's go. It's over.' Pantoja was grazed by a bullet that damaged his hearing. Ramirez was shot in the left side, left thigh, and right buttocks, and was hospitalized for almost three weeks. Bedolla died as a result of the shooting." (*Dominguez, supra*, B159705 at pp. 2-4.)

"About six weeks after the shooting, the police searched Dominguez's home (which was one block from Ramirez's house) pursuant to a warrant. The police found: a large 'H' painted near the front door; a gun case with live rounds; a bullet-proof vest; a backpack with boxes of live ammunition and magazines; an AK-47 assault rifle with bayonet; a .22-caliber long rifle; a gun cleaning kit; boxes of various types of ammunition, including .45-caliber, .25-caliber, and .22-caliber; papers showing that the Astro van belonged to Dominguez and his father; photographs of Dominguez and other gang members making gang signs in a show of gang allegiance; a card addressed to 'Looney' and stating there would be a rosary for Malo (who had died on August 26) at Santa Teresita Church at 7:00 p.m. on August 31 (the day of the shooting). The church is adjacent to Ramona Gardens and six or seven blocks from Ramirez's house." (*Dominguez, supra*, B159705 at pp. 5-6.)

Dominguez was never identified as a shooter.

The jury was instructed with CALJIC No. 3.00, instructing that "[e]ach principal, regardless of the extent or manner of participation, is equally guilty," and that principals include aiders and abettors.

The jury was further instructed with CALJIC No. 3.02, which states that "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also

4

guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty of the crimes of murder and attempted murder . . . , you must be satisfied beyond a reasonable doubt that: [¶] . . . [¶] The crimes of murder and attempted murder were a natural and probable consequence of the commission of the crime of assault with a firearm."

Finally, the jury was instructed with CALJIC No. 820, which instructed that "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree," and if the jury finds that "the killing was preceded and accompanied by a clear, deliberate intent on the part of the *defendant* to kill, which was the result of deliberation and premeditation, . . . it is murder of the first degree." (Italics added.) It also told the jury that "To constitute a deliberate and premeditated killing, the *slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill." (Italics added.)

The jury convicted Dominguez of one count of first degree murder and two counts of premeditated attempted murder, and found an armed principal allegation to be true. He was sentenced to state prison for 26 years to life plus two consecutive life terms.

On appeal, the sole issue was whether Dominguez received ineffective assistance of counsel related to counsel's failure to object to the admission of multiple items of evidence. We found no ineffective assistance because the challenged evidence was admissible. (*Dominguez, supra*, B159705 at pp. 3-5.)

We expressed no opinion on what theory formed the basis of Dominguez' conviction.

## B.    2018 Order

In 2014, our Supreme Court held that the natural and probable consequences rule cannot be a basis for convicting a defendant of first-degree murder.  (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)  In 2018, Dominguez filed a habeas petition based on *Chiu* (*Chiu* petition), seeking to have his first-degree murder conviction reduced to second-degree murder and to be resentenced accordingly.  The trial court denied the petition, finding that "this was a planned gang retaliatory shooting" that did not involve felony-murder *or "natural or [probable] consequences of some other targeted crime,"* and Dominguez "was not only a direct aider and abettor thus falling outside the scope of *Chiu*, he was also instigator, intimidator, planner, provider of the transportation and possibly even the ammunition and finally benefactor of the crimes charged."  (Hereafter the "2018 Order"; italics added.)

## C.    Instant Petition

In 2019, Dominguez filed a petition in the superior court for resentencing under section 1170.95, which applies to those convicted of murder under specified theories, and requested the appointment of counsel.

Based on the *Dominguez* opinion, the 2018 Order, and the "records and files" in the case, the trial court denied the petition without appointing counsel, finding Dominguez was ineligible for relief under any applicable theory.

The court found that (1) we had already "rejected" Dominguez' claims in our discussion in the original *Dominguez* opinion; (2) that the superior court in its 2018 Order specifically

found "that neither the felony-murder rule for liability nor the natural and probable consequences doctrine were the basis of [appellant's] culpability supporting his convictions"; (3) that because Dominguez had received the 2018 Order, "he was well aware that his assertion under 2a of the instant [1170.95] petition . . . was patently false after having been so advised by this Court in its October 4, 2018 Order"; and (4) an independent analysis of the facts set forth in *Dominguez* established that Dominguez "does not qualify for and cannot benefit" from section 1170.95, subdivision (a) because he "was not convicted under the felony murder theory of liability nor the natural and probable consequences doctrine."

## DISCUSSION

Senate Bill No. 1437 was enacted in 2018 to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It accomplished this by amending section 188, subdivision (a)(3), to require that all principals to murder must act with express or implied malice to be convicted of that crime, with the exception of felony murder under section 189, subdivision (e). (Stats. 2018, ch. 1015, § 2.)

For a felony murder conviction under section 189, subdivision (e), Senate Bill No. 1437 required that the defendant be the actual killer, an aider and abettor to the murder who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 3.)

7

In 2021, the Legislature passed and the Governor signed into law Senate Bill No. 775, which amended subdivision (a) of section 1170.95 to permit relief for certain petitioners convicted of "attempted murder under the natural and probable consequences doctrine," resolving an ongoing issue in the courts. (Sen. Bill No. 775 (2020-2021 Reg. Sess.) at § 2.) The amended section 1170.95, subdivision (a)(3), states that relief for individuals convicted of attempted murder may be available if they could not presently be convicted of murder or attempted murder because of changes that Senate Bill No. 1437 made to sections 188 and 189 in 2018. (Stats. 2018, ch. 1015, §§ 2-3.)

Section 1170.95 now permits a person convicted of murder or attempted murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and resentence on any remaining counts if the person could not be convicted of murder or attempted murder under the new section 188 or 189. (§ 1170.95, subd. (a).) A petition for relief under section 1170.95 must include: "(A) A declaration by the petitioner that he or she is eligible for relief under this section, based on all the requirements of subdivision (a). [¶] (B) The superior court case number and year of the petitioner's conviction. [¶] (C) Whether the petitioner requests the appointment of counsel." (§ 1170.95, subd. (b)(1).)

If the petition contains the required information, the court must appoint counsel and then conduct a prima facie analysis, with briefing by the parties, as to the petitioner's eligibility before determining whether to issue an order to show cause. (§ 1170.95, subd. (c); *People v. Lewis* (2021) 11 Cal.5th 952, 961-970.)

Here, Respondent concedes that the superior court erred by denying Dominguez' petition at the prima facie stage without appointing counsel.

However, this error is subject to review for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, which asks whether it is reasonably probable that the petitioner would have obtained a more favorable outcome if counsel had been appointed. (*Lewis*, *supra*, 11 Cal.5th at pp. 972-974.) This standard is not met where the record of conviction shows as a matter of law that the petitioner was convicted under a theory of murder that remains valid after Senate Bill No. 1437. (*People v. Mancilla* (2021) 67 Cal.App.5th 854, 864.)

Here, with respect to the first degree murder conviction, Respondent argues that Dominguez' first degree murder conviction establishes that the jury found he personally harbored actual malice, which precludes relief under section 1170.95 as a matter of law. Dominguez argues that the "defendant"/"slayer" discrepancy in the fourth and seventh paragraphs of CALJIC No. 8.20, *ante*, gives rise to the possibility that the jury never found him to have harbored actual malice, as he was not determined to be the shooter/slayer.

We need not reach the issue whether Dominguez' first degree murder conviction precludes relief as a matter of law, because even if the jury found he harbored actual malice as to the murder count, that finding would not transfer to the attempted murder charges. (*People v. Mariscal* (2020) 47 Cal.App.5th 129, 137 [intent to kill must be examined independently as to each alleged attempted murder victim].)

But on the merits, Respondent overlooks aspects of the jury instructions pertaining to vicarious liability. The jury was

9

informed about the natural and probable consequences doctrine as follows: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty of the crimes of murder and attempted murder . . . , you must be satisfied beyond a reasonable doubt that: [¶] . . . [¶] The crimes of murder and attempted murder were a natural and probable consequence of the commission of the crime of assault with a firearm."

The instruction on deliberate and premeditated murder stated that if the jury finds that "the killing was preceded and accompanied by a clear, deliberate intent on the part of the *defendant* to kill, which was the result of deliberation and premeditation, . . . it is murder of the first degree. (Italics added.) But it also told the jury that "[t]o constitute a deliberate and premeditated killing, the *slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill." (Italics added.) Because under these instructions the jury could have based its conviction of Dominguez on a finding that someone other than he—the slayer—deliberated and premeditated the murder, we cannot rule out the possibility that the jury found Dominguez guilty of first degree murder under the natural and probable consequences doctrine.

As to the attempted murder charges, Dominguez' jury was instructed on the natural and probable consequences theory of liability. The record of conviction therefore does not show as a matter of law that the jury eschewed that theory, and that he is ineligible for relief under section 1170.95. Therefore, we must

10

reverse the trial court's order denying Dominguez' petition and remand the matter for a hearing pursuant to section 1170.95.

Respondent argues that the trial court's 2018 Order bars Dominguez litigating the issue of natural and probable consequences liability via a section 1170.95 petition, because if he was dissatisfied with the court's ruling, his remedy was to file a habeas petition here or with the Supreme Court.

We need not reach this issue either, because the 2018 Order applied only to Dominguez' murder conviction, and it is not clear from the record that the trial court intended its findings to apply to the attempted murder charges as well.

But even on the merits, we disagree that the 2018 Order carries preclusive effect here. "Under California law, collateral estoppel will apply in any setting *only* where such application comports with fairness and sound public policy." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 835.) Here, the Legislature has provided a statute specifically to revisit old convictions. It would contravene the policy evinced by that amendment to grant preclusive effect to earlier findings made under a distinct procedural mechanism—i.e., habeas corpus proceedings—and different legal scheme—i.e., *Chui*. (See *People v. Carmony* (2002) 99 Cal.App.4th 317, 325-326 [20-year-old not true finding in trial on one issue given no preclusive effect in a later proceeding on a different issue].)

We need not reach Dominguez' argument that by relying on the 2018 Order and our recitation of facts in *Dominguez* the trial court engaged in improper fact finding.

11

## DISPOSITION

The trial court's order is reversed and the matter remanded for further proceedings pursuant to subdivision (c) of section 1170.95, including the appointment of counsel, the making of a prima facie analysis and, if necessary, the issuance of an order show cause.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.